In re John R. McISAAC, Joseph H. McIsaac, Alleged Bankrupts.

Bankruptcy Nos. 78–1595–L, 78–1594–L, 79–210–L and 79–211–L.

United States Bankruptcy Court, D. Massachusetts.

April 12, 1982.

John D. Hanify, Hanify, King & Glovsky, Professional Corp., Boston, Mass., for John L. Vernalia.

John R. McIsaac pro se.

Joseph H. McIsaac pro se.

## MEMORANDUM RE ADJUDICATION OF ALLEGED BANKRUPTS

THOMAS W. LAWLESS, Chief Judge.

On August 24, 1978, John L. Vernalia filed creditor's petitions against John R. McIsaac and Joseph H. McIsaac. On October 16, 1978, the McIsaacs filed a motion to extend time for filing an answer. This motion was allowed and on November 6, 1978, the McIsaacs filed an answer, counterclaim and motion to dismiss. Between February 2, 1979 and March 23, 1979, additional creditors sought to intervene in the involuntary proceedings against the McIsaacs. These creditors included Commercial Union Insurance Company, American Employers' Insurance Company, George L. Malone, Richard Sullivan, Franklin Street Associates and Alcourt Management Corporation. Eventually, all of the proceedings against the McIsaacs were consolidated. After allowance of a motion to amend their previous answer, the McIsaacs filed an amended answer on April 3, 1979. On April 21, 1981, the McIsaacs' motion to dismiss was denied by the court.

A series of five hearings were held on April 21, 1981, May 21, 1981, June 23, 1981, August 25, 1981, and December 3, 1981. At each hearing, evidence was presented and testimony was transcribed. Numerous documents and four volumes of deposition testimony dated December 7, 1978, December 12, 1978, January 25, 1979 and January 31, 1979 were admitted into evidence. Pursuant to Rule 1006 of the Federal Rules of Evidence, summaries of the depositions were prepared and filed with the court. No demand for jury trial was made by the McIsaacs.

The petitions filed by Vernalia and the other creditors essentially allege the first act of bankruptcy set forth in § 3(a) of the Bankruptcy Act, 11 U.S.C. § 21(a).[1] The petitions state that the alleged bankrupts concealed cash in the amount of $141,250.00 with the intent to defraud, hinder, or delay their creditors. All of the petitions allege that the McIsaacs each have less than twelve creditors.

The McIsaacs contend that: they did not conceal cash with the intent to defraud or hinder creditors; they each have more than twelve creditors; they were not insolvent on the date that the petitions were filed; and these involuntary proceedings were commenced in bad faith.

After consideration of all of the evidence, testimony, and submissions of the parties, I made the following findings of fact:

In 1969, Joseph and John McIsaac owned the stock of the L. H. McIsaac company, a family operated construction business which had been organized by their father in the mid-1930's. The McIsaac brothers presently own interests in two other entities, Auburndale Development Corporation ("Auburndale") and Auburndale Gardens Limited Partnership ("Auburndale Gardens").

On June 15, 1972, the McIsaacs, John Vernalia and John W. Kunhardt entered into a limited partnership agreement for the purpose of building homes and apartments in Cambridge, Massachusetts. The development was to be financed in part by the Massachusetts Housing and Finance

---

1. § 3(a) of the Bankruptcy Act provides:

    Acts of bankruptcy by a person shall consist of his having (1) concealed, removed, or permitted to be concealed or removed any part of his property, with intent to hinder, delay, or defraud his creditors or any of them, or made or suffered a transfer of any of his property, fraudulent under the provisions of section 67 or 70 of this Act.

Agency ("MHFA") and in part by funds obtained from limited partner investors. The partnership agreement was amended on April 24, 1973. The partnership became known as Franklin Street Associates ("Franklin Street") and the McIsaacs, Vernalia and Kunhardt were the general partners. Upon learning that the McIsaacs were experiencing financial difficulties, Vernalia and Kunhardt persuaded the McIsaacs to enter into an indemnification agreement (exhibit E; transcript 4/21/81 at 28). Under the terms of this agreement, the McIsaacs were required to indemnify the other general partners for any losses they sustained as a result of the business ventures undertaken by Franklin Street.

Franklin Street retained the March Company, a professional syndicator, to find limited partner investors who would help finance the Cambridge project (transcript 4/21/81 at 41). The partnership ultimately obtained $2,709,360.00 in MHFA financing together with $412,500.00 from limited partners secured by the syndicator. The March company collected funds provided by the limited partners and transferred that money to the general partners in three installments (exhibit H· ¶ 7(b)). The McIsaacs had control over those funds and retained the last installment of $141,250.00, received from the March Company (transcript 4/21/81 at 42, 70–87). The evidence indicates that, under the terms of the partnership agreement, a substantial portion of this sum should have been paid to partnership creditors. The McIsaacs were only entitled to approximately $50,000.00 of this final installment (transcript 12/3/81 at 99–100). The McIsaacs never accounted for this money and, consequently, a number of partnership creditors were not paid (transcript 12/3/81 at 99). The unpaid creditors include the March Company, Ferraro and Company, Price Waterhouse and Alcourt Management Corporation (transcript 12/3/81 at 82, 83, 99). Subsequently, the March Company commenced a civil action against the McIsaacs, the partnership and Vernalia. During the course of this action, the McIsaacs continually stated that, if a judgment was entered against them, they would pay that judgment out of the funds received from the March Company (transcripts 4/21/81 at 87, 88; 5/21/81 at 21–25; 12/3/81 at 100–01). On June 23, 1978, the March Company obtained a separate judgment against the McIsaacs in the amount of $38,700.00 (exhibits K, L). That judgment remains unsatisfied. The actions brought against Vernalia and the partnership are still pending. As a result of this litigation, Vernalia incurred expenses for legal fees in excess of $4,000.00. He requested that the McIsaacs indemnify him for these expenses. The McIsaacs refused, claiming that the indemnity agreement did not provide for the reimbursement of such expenses (transcript 12/3/81 at 101). Ferraro and Company also commenced an action against Vernalia and the McIsaacs for a claim which arose out of a land transaction (transcript 4/21/81 at 90). The McIsaacs have not adequately explained why they withheld partnership funds which were earmarked for the payment of creditors.

Vernalia eventually realized that the McIsaacs had no intention of satisfying the judgment and that they had, in fact, concealed the final installment (transcript 12/3/81 at 100, 101). After searching the local court records and other sources, Vernalia was unable to identify twelve or more creditors of either of the alleged bankrupts (transcript 4/21/81 at 92–94, 106). Vernalia filed involuntary petitions within four months after the date that judgment was entered against the McIsaacs in the March Company litigation. The date of concealment as indicated by the petitions is the date of entry of that judgment.

The McIsaacs filed lists of creditors with the court in an attempt to establish that they each had twelve or more creditors (exhibits C, D). The court ordered the McIsaacs to produce documentary evidence that would verify the existence of these creditors (transcript 6/23/81 at 102–05). The McIsaacs were unable to produce this evidence (transcript 12/3/81 at 135–42). When questioned concerning the whereabouts of the requested documentation, the McIsaacs either were not sure where it was;

did not have it at the time; or represented that it had been lost or destroyed (depositions 12/7/78 at 24–28; 1/25/79 at 32–37; transcript 12/3/81 135–42). Joseph McIsaac could not state under oath that he had twelve or more creditors (deposition 12/7/78 at 21–22). The McIsaacs took the position that the claims asserted by the Franklin Street partnership were in fact a multitude of claims by the individual limited partners (transcript 4/21/81 at 139–41). In addition, several of the individuals and entities whom the McIsaacs listed as their personal creditors were actually creditors of various entities which the McIsaacs owned or operated (transcript 12/3/81 at 142; deposition 12/7/78 at 38–45).

On April 21, 1981, the McIsaacs filed separate financial statements with the court in an attempt to prove solvency. Each McIsaac listed approximately $100,000.00 in assets. Joseph McIsaac's statement showed liabilities of approximately $80,000.00. John McIsaac's statement listed liabilities totalling $65,000.00 (exhibits A, B).

The financial condition of the alleged bankrupts has remained substantially the same during the course of these proceedings (transcript 5/21/81 at 74).

Both financial statements list as an asset fifty jointly held shares of stock of Auburndale Development Corporation. According to the McIsaacs, the stock's value is uncertain. Joseph and John McIsaac are, respectively, the President and Treasurer of Auburndale (transcript 5/21/81 at 43, 80). The brothers gave a confusing account of their ownership interests in Auburndale. John McIsaac stated that he owned 51% of the Auburndale stock and that Joseph McIsaac owned the remaining 49% of that stock. He also stated that the stock had been pledged to the First National Bank and that the Bank had possession of the stock (deposition 1/25/79 at 8–11). A representative of the Bank testified that this pledge had occurred (transcript 6/23/81 at 45–51). John McIsaac later testified that he and his brother Joseph owned jointly only 50% of the Auburndale stock and that a portion of the stock was owned by a cousin in Florida

(transcript 5/21/81 at 80). John McIsaac indicated that Auburndale had "voided" the pledge and issued new stock to himself and his brother (transcript 5/21/81 at 86). The issuance of the new stock resulted in a breach of the pledge agreement which provided that no other Auburndale stock would be issued without the consent of the Bank (exhibits P, Q, R, S). John McIsaac was unable to tell the court where the stock was located (transcript 5/21/81 at 84–85).

Joseph McIsaac testified that he did not know how many shares of Auburndale stock had been issued and that he was uncertain as to the amount of that stock owned by him (transcript 5/21/81 at 42). In addition, he denied that the stock had ever been pledged to the First National Bank (transcript 5/21/81 at 44). He was also unaware of whether the corporation had recently filed income tax returns (5/21/81 at 43, 56).

Auburndale has not conducted business or had employees since 1977 (transcript 5/21/81 at 79). Nor does it own or lease any physical facilities or offices (transcript 5/21/81 at 83). In the civil case of *Auburndale Development Corp. v. The First National Bank of Boston*, 522 F.Supp. 1147 (D.Mass.1981), a judgment was entered against Auburndale in the amount of $378,737.00 (exhibit x). In another related case, *The First National Bank of Boston v. John R. McIsaac, et al*, No. 32631 (Suffolk Superior Court. Nov. 18, 1981), the Suffolk Superior Court found that: Auburndale was insolvent; the McIsaacs had fraudulently mortgaged Auburndale property to the McIsaac Family Trust; and said mortgage was invalid (exhibit y).

The most substantial asset listed by each of the McIsaacs is their interest in the Auburndale Gardens Limited Partnership. The McIsaacs have represented that the total value of their interest in this entity is $180,000.00. The evidence indicates that the only asset of the partnership is a building permit relating to specific property that the partnership had an option to purchase. This property which was originally owned by Auburndale Development Corporation, was sold at a foreclosure sale (transcript 5/21/81 at 90–93).

The value of the McIsaacs' interest in Franklin Street is speculative. The evidence does not support their assertion that they invested cash in this partnership. Their testimony and other evidence indicates that the funds which they claim to have invested were in fact a portion of the limited partners' contribution (transcript 5/21/81 at 52–54; exhibit H § 7(a)(b)). Also, the terms of the Franklin Street partnership agreement provide for the "retirement of a general partner" in the event that a creditor's petition is filed against that general partner (exhibit H § 30(d)(ii)).

The evidence indicates that neither Auburndale or Auburndale Gardens owns any assets of substantial value. Even if some value could be ascribed to the Auburndale stock, the McIsaacs' ownership of that stock is uncertain. Although Franklin Street appears to be a valuable entity, the McIsaacs' retention of partnership funds and the terms of the partnership agreement would substantially reduce the value of their partnership interests. It is evident, therefore, that the value of the McIsaacs' interest in these entities is nominal.

The alleged bankrupts claim as an asset certain lawsuits which they have commenced against their creditors. In his Financial Statement, John McIsaac offset his liabilities to certain creditors by amounts that he expects to recover in future litigation against those creditors. He did not explain the nature of the underlying debts, nor did he identify the amounts of those debts (exhibit A). The McIsaacs' success in these lawsuits is clearly speculative. Moreover, in light of the brothers' proven tendency to inflate the value of their assets, I am convinced that no value should be attributed to this litigation.

The evidence also indicates that in 1979, John McIsaac pled guilty to a charge of making false or misleading statements in a bankruptcy proceeding in violation of 18 U.S.C. § 152 (exhibit M). These statements were made by John McIsaac in connection with proceedings involving the family owned construction business, the L. H. McIsaac corporation. *See L. H. McIsaac*

*Co., Inc.,* No. 75–511–G. One of the conditions of John McIsaac's probation was that he repay $25,000.00 to the bankrupt corporation's Trustee (exhibit M). There is no indication that this obligation was ever satisfied, yet it is not included as a liability on John McIsaac's Financial Statement (exhibits A, C).

Absent from the McIsaacs' Financial Statements is any reference to the amounts of the claims of Commercial Union Insurance Company and American Employers' Insurance Company. These companies have filed creditors petitions and claims against the McIsaacs totalling approximately $550,-000.00 (Petitions of Commercial Union Insurance Company and American Employers' Insurance Company, dated March 21, 1979). Their claims arise out of indemnity agreements which they entered into with the McIsaacs. The McIsaacs have acknowledged the existence of these claims as of August 24, 1978 (exhibits C, D). In addition, the Financial Statements omit any reference to the amount of a claim of the First National Bank of Boston, which claim is in excess of $400,000.00 (transcript 6/23/81 at 47).

Other creditors have asserted claims against the McIsaacs which are not included in the McIsaacs' Financial Statements. Franklin Street has a claim for rent arising from the McIsaacs' use of an apartment located within the partnership's apartment complex. John Vernalia has a claim for $4,000.00 based upon the indemnity agreement he entered into with the McIsaacs.

Throughout the course of these proceedings, the McIsaacs have generally been uncooperative and unresponsive. When questioned about their financial status, they have professed an inability to remember basic facts and details which should have been well known to them (transcripts 5/21/81 at 29–50, 62–64, 81, 84–93; 6/23/81 at 48, 49, 76–102). They have displayed this lack of knowledge even though they knew that a determination of their financial positions was essential to these proceedings. John McIsaac attempted to deny the existence of his guilty plea for making false and

misleading statements in a bankruptcy pro- ceeding (transcript 6/23/81 at 18). In his capacity as President of Auburndale, Joseph McIsaac could not identify his interest in the corporation; confirm whether the stock had been pledged; or indicate whether the corporation had filed income tax returns (transcript 5/21/81 at 43, 44, 56). John McIsaac, Treasurer of Auburndale, could not even tell the court where the stocks were located (transcript 5/21/81 at 84–85).

█ For the purposes of § 3(a) of the Bankruptcy Act, concealment has been defined to include hiding or withdrawing property from observation, preventing the discovery of property or withholding knowledge of the existence, ownership or location of property. *In re Verona Construction Co.*, 126 F.2d 976 (3rd Cir. 1942) *quoting* 1 Collier on Bankruptcy, 14th Ed., ¶ 3.103. Although the petitioning creditor has the burden of proving concealment, a *prima facie* case is made out where the natural and inevitable result of the debtor's acts will be the delay or disappointment of creditors. Collier on Bankruptcy 14th Ed., ¶ 3.105; *See In re Lampros Inc.*, 18 F.2d 633 (D.Mass.1927). The evidence indicates that the McIsaacs retained the entire final installment of partnership funds to the detriment of the partnership's creditors. Since the McIsaacs failed to provide any reasonable explanation for their actions, it is apparent that they intended to conceal those funds and place them beyond the reach of their creditors. *Peterson v. Peterson*, 400 F.2d 336 (8th Cir. 1968).

█ The four month limitation in § 3(b) of the Bankruptcy Act[2] begins to run upon continuing concealments only from the time of discovery of those concealments. *In re Verona Construction Co.*, 126 F.2d 976 (3rd Cir. 1942). In the instant case, Vernalia discovered the concealment when the McIsaacs refused to satisfy the judgment which had been entered against them in the March Company litigation. The judgment was entered on June 23, 1978. Thus, the involuntary petitions which were filed on August 24, 1978 were timely filed.

█ Under § 59(b) of the Bankruptcy Act, 11 U.S.C. § 95(b), at least three creditors must join in an involuntary petition if the bankrupt's creditors total more than twelve. If there are less than twelve creditors, only one creditor need sign the petition. If an alleged bankrupt raises the defense that there are twelve or more creditors, § 59(d) of the Bankruptcy Act provides that the bankruptcy judge shall delay the hearing for a reasonable time to allow the parties in interest an opportunity to be heard. This section further states: "If upon such hearing it shall appear that a sufficient number of qualified creditors have joined in such petition or, if prior to or during such hearing, a sufficient number of qualified creditors shall join therein, the case may be proceeded with, but otherwise it shall be dismissed." Section 59(f) of the Bankruptcy Act provides: "Creditors other than the original petitioners may at any time enter their appearance and join in the petition." These provisions were discussed in *Providence Box & Lumber Co. v. Goodrich-Daniell Lumber Corp.*, 80 F.Supp. 61 (D.Vt.1948).

These sections permit creditors to intervene in support of the petition and thus prevent the dismissal by the court where it is shown that one of the several petitioners is disqualified from joining in the petition.

\* \* \* \* \* \*

Creditors, by intervening in support of the petition, acquire the status of petitioning creditors as of the date on which the original petition was filed, And since section 59, sub. f provides that a creditor "may at any time" intervene and join in the petition, the creditor's right to intervene, within the proper time, is not subject to the court's discretion. Intervention to join in the petition, as a general rule, is a matter of right.

---

**2.** § 3(b) states in pertinent part:

A petition may be filed against a person within four months after the commission of an act of bankruptcy.

Id. at 63; *See In re Christian Porter Aluminum Co.*, 316 F.Supp. 1340 (D.C.Cal.1970).

At least five creditors, in addition to Vernalia, have joined in these proceedings against the McIsaacs. Two of these creditors, Commercial Union and George Malone are included in the McIsaacs' lists of creditors. The claims of these creditors are provable and their intervention is clearly proper. Hence, the McIsaacs' assertion that they have twelve or more creditors is inopposite.

Furthermore, the requirement of three petitioning creditors if the total number of the bankrupt's creditors is twelve or more is jurisdictional in nature and may be waived. *General Kontrolar Co. v. Allen*, 124 F.2d 123 (6th Cir. 1942); *In re National Republic Co.*, 109 F.2d 167 (7th Cir. 1940), *cert. denied, Arbetman v. Reconstruction Finance Corp.*, 309 U.S. 671, 60 S.Ct. 614, 84 L.Ed. 1017 (1940). The McIsaacs contravened Bankruptcy Rule 104(e) by failing to disclose the identity of their creditors and the amounts and nature of the claims involved. Although the McIsaacs eventually filed lists of creditors these lists were incomplete and inadequate. At trial, the McIsaacs were unable to provide specific information or evidence that would establish the existence of creditors. Instead, they gave vague and general descriptions of their creditors. This testimony was for the most part, unconvincing. Thus, the McIsaacs have waived any defense based upon the existence of twelve or more creditors.

The McIsaacs' contention that these proceedings were commenced in bad faith is not supported by the evidence. Vernalia clearly took reasonable steps to ascertain the number of the McIsaacs' creditors before he filed his petitions.

Finally, the testimony of the McIsaacs and the documentary evidence filed with the court clearly establish that, at the time the creditors petitions were filed, neither of the alleged bankrupts had sufficient assets to satisfy their respective debts.

Based upon the foregoing findings of fact and conclusions of law, I conclude that an order should be entered adjudicating John McIsaac and Joseph McIsaac bankrupts.